**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In Re:  JOSEPH PAUL BENINATI | § | Case No. 20-10096-tmd |
| Debtor | § | |
| | § | Chapter 7 |

---

**BRIEF AND ARGUMENTS IN SUPPORT OF DEBTOR'S RESPONSE**
**TO THE SECOND JOINT MOTION FOR TO CONTINUE AND EXTEND**
**DEADLINES TO OBJECT TO DEBTOR'S DISCHARGE AND RESOLVE**
**RELATED DISCOVERY SCHEDULE**
**(Docket #96)**

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Joseph Paul Beninati, Chapter 7 Debtor ("Debtor") and files this Brief in support of Debtor's Response (and in opposition) to the Second Joint Motion to Continue and Extend Deadlines to Object to Debtor's Discharge and Resolve Related Discovery Schedule, and would show as follows:

**I.**
**PRELIMINARY STATEMENT**

In this Brief and in these pleadings the Court will learn that the Judgement that led to this Debtor's Chapter 7 arose from a non-recourse Loan which neither the Debtor nor his family received any Loan proceeds nor provided any repayment guarantees advanced for the "as completed" $1 billion dollar high rise real estate development project (herein the "Sutton Tower Project").   In fact, the Debtor and his family interests lost millions of dollars of equity by investing into the successful land assemblage in one of New York City's premier and historically wealthy neighborhoods, and that as completed by the Debtor's work, the land assemblage greatly overcollateralized the Loan advances (according to multiple third party appraisals).  Through conflicts of interest and manipulations described below, the Judgment Creditor obtained 100% control of the completed land assemblage after a Chapter 11 failed to resolve the disputes.  In that

Chapter 11 Bankruptcy Judge Lane found that a $1.4 million-dollar portion of the Judgment Creditor's loan to be criminally usurious, which the Creditor released, forgave and waived. The Judgment Creditor is now developing the Sutton Tower Project towards earning millions in profits after the Creditor-now-owner completes the 1,000-foot-tall Sutton Tower Project.

### A.  The Debtor's "Pure Leverage Guaranty" (or the "Bad Boy Guaranty") of the Judgment Debt

In stark contrast, the Debtor Joseph Beninati filed his Chapter 7 case as a result of the $24+ million judgment arising from the same Sutton Tower Project, imposed by a triggering event in a "**Pure Leverage Guaranty**"[1] also known as a "**Bad Boy Guaranty**" on what was always a **non-recourse loan**, and initially agreed and advanced without any guaranty. Upon a renewal, the Borrower's counsel (Mr. Kalikow, the relative to the Kalikow Family as the Borrower's lender, described in detail below) advised on the execution of a guaranty providing for liability *only upon the occurrence of the filing of a bankruptcy case for the borrowers*.

Unquestionably, the lenders (now the Judgment Creditor) did not care about the financial condition or position of this Debtor when the project was initiated, nor even when the Sutton Tower Project was shuttered by the lender's refusal to fund the balances available on the loans promised. *The Debtor's liability only arose if, and (as in this case when) the Debtor participated in the authorization of the filing of the Chapter 11 cases of the borrowers*. The issue of the Debtor's financial condition, financial dealings, assets, and liabilities, use of the loan proceeds, or the development of the project, were never considerations to the lending decision, or the decision to advance funds, nor the consideration for the "collection" of a deficiency of any of these non-recourse loan funding.

---

[1]  Professor Jay Westbrook first coined the phrase "Pure Leverage Guaranty". *See, infra* quoting Jay Lawrence Westbrook, Two Thoughts About Insider Preferences, 76 MINN. L. Rev. 73, 85 (1991) at 80.

**B.      The Debtor's "Catch 22" as the Genesis of the Judgment Debt**

The Debtor's guaranty liability arose only upon the Title 11 case filing by the Judgment Creditor's Borrower, as a "punishment" of the Debtor for allowing such filing. The Judgment reflects the collection of now-$35+ million as a "penalty" arising from the exercise by the Lender of this "punitive remedy" to accomplish that which public policy and Delaware law prohibits – the contracting away of a Debtor's right to file a voluntary petition under 11 U.S.C. 101, *et seq*[2] or the exercise of the fiduciary obligation due the borrower's creditors by management under Delaware law.  This guaranty was designed to place the "control person" of the borrower in a "Catch 22"[3] by mandating the breach of the Debtor's fiduciary duties to statutory and common law third parties so as to avoid his personal liability the Lender on the claimed debt.[4]  Thus, the term "Pure-Leverage

---

[2]      A prepetition waiver of a discharge of a particular debt or of all debts is against public policy and unenforceable.  *In re Baumhaft*, 271 B.R. 517 (Bankr. E.D. Mich. 2001). The U.S. Bankruptcy Court for the Eastern District of Kentucky held that provisions of an LLC operating agreement that were added *incidental to the closing of a commercial loan* served no purpose other than to frustrate the LLC's ability to commence a bankruptcy case and were thus unenforceable. *In re Lexington Hosp. Grp., LLC*, 2017 WL 4118117 (Bankr. E.D. Ky. Sept. 15, 2017).  The court's holding follows two other recent decisions similarly voiding restrictions on bankruptcy rights. *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258 (Bankr. D. Del. 2016); *In re Lake Michigan Beach Pottawattamie Resort, LLC,* 547 B.R. 899 (Bankr. N.D. Ill. 2016).

[3]      Joseph Heller coined the term in his 1961 novel Catch-22, which describes absurd bureaucratic constraints on soldiers in World War II. The term is introduced by the character Doc Daneeka, an army psychiatrist who invokes "Catch-22" to explain why any pilot requesting mental evaluation for insanity—hoping to be found not sane enough to fly and thereby escape dangerous missions—demonstrates his own sanity in creating the request and thus cannot be declared insane.  Thus, a "catch-22" is a dilemma or difficult circumstance from which there is no escape because of mutually conflicting or dependent conditions.

[4]      *Lichtenstein v. Willkie Farr & Gallagher LLP*, 120 A.D.3d 1095, 1098-99, 992 N.Y.S.2d 242, 246 (App. Div. 1st Dept. 2014) illustrates the dilemma faced by Joseph:

> The complaint in this case makes it plain that ***Lichtenstein was not disinterested, because his stewardship of ESI was affected by a conflict between his fiduciary duties as a director of the company and his personal exposure to $100 million in liability on the ("bad boy") guarantees in the event of ESI's voluntary bankruptcy***. As disclosed by the complaint, Lichtenstein's conflict was the reason why Weil Gotshal, ESI's restructuring counsel, advised him to retain separate counsel. ***Had Lichtenstein failed to authorize or delayed ESI's bankruptcy filing, he would have been faced with uncapped personal liability on the basis of a breach of his duty to act in good faith. Such a breach occurs  "when a director 'intentionally acts with a purpose other than that of advancing the best interests of the corporation' "*** (*In re USA Detergents, Inc*., 418 BR 533, 545 [D Del 2009] [citation omitted]).

*Id. Lichtenstein* (Emphasis added.)
It appears that it has not been argued that enforcement of a bad boy guaranty against bankruptcy filing in law and in fact is compelling a result that is "aiding and abetting the breach of fiduciary duty" making the lender co-responsible to the borrower's shareholders and/or creditors when the bankruptcy remedy is ignored..  *Lichtenstein* goes on to hold:

Guaranties" originates from an article by Professor Jay Westbrook to refer to any insider guarantee from a guarantor who is "not likely to be able to offset any shortfall in the debtor's performance" but, a*ccording to Professor Westbrook, the point is that, regardless of whether or not the <u>guarantor</u> is solvent, the entire purpose of the guaranty is to control behavior rather than to provide additional financial resources. See*, Jay Lawrence Westbrook, Two Thoughts About Insider Preferences, 76 MINN. L. Rev. 73, 85 (1991) at 80.[5]

### C. The Judgment Is Also the Result of the Judgment Creditor's Express <u>Waiver of All Claims</u> In Order To Obtain This Money Judgment

The Transcript of the hearing on the Judgment Creditor's Summary Judgment, at which the Court granted summary judgment to the Judgment, illustrates the nature of the Kalikow Lender's (Sutton 58) money-judgment only recovery [beginning at pg. 4, line 12[6]]:

```
12      MR. GREENBERG:  I don't know what it comes out
13      to but, your Honor, I'm here to tell you today that what
14      we are seeking now on the summary judgment motion is only
15      the $20 million principle and the $4 million additional
16      interest as defined in the loan documents.
17      THE COURT: Not 24 percent on top of that?
18      MR. GREENBERG: ***We've waiving everything else***….

20      Your Honor, this is a bad boy guaranty commonly
21      known. It's triggered by certain bad boy acts. ***One of***
22      ***the bad boy acts is filing, the borrower***, this is the
23      owners of the borrower, ***for bankruptcy to prevent us from***
```

---

Under Delaware law, the "classic example" of what constitutes a breach of the duty of loyalty and the standard employed in determining whether there exists such a breach, ***is when a fiduciary is conflicted or is self-dealing***. *In re Walt Disney Co. Derivative Litig*., 907 A2d 693, 751 (Del. Ch. 2005) *affd*, 906 A2d 27 (Del. 2006). The duty of loyalty "also encompasses cases where the fiduciary fails to act in good faith." *Stone ex rel. AmSouth Bancorporation v Ritter*, 911 A2d 362, 370 Del. 2006." *Id*. at ¶ 8.

The Kalikow Family loan documents discussed below, and their litigation to foreclose and own the Sutton Tower Project, mandated a breach of fiduciary duties by the Debtor to avoid the Debtor's personal liability to the Kalikow Lenders, by breaching the Debtor's duty to equity and unpaid creditors of the borrower.

[5]     Thus, in *Borman, LLC v. 18718 Borman, LLC*, 777 F.3d 816, 818 (6th Cir. 2015) [in interpreting the "Mortgage Loan Act (NMLA), Mich. Comp. Laws § 445.1591 et seq." and a "bad boy" guaranty triggered because of an insolvency covenant declared "… that the post-closing solvency covenant is invalid, unenforceable, and against public policy... (holding that) [t]his may have the effect of invalidating plaintiff's entitlements based on the contract,…"

[6]     Transcript, *Sutton & 58 Associates vs. Joseph Beninati, et. al*, cause # 651296/16, New York Supreme Court, January 22, 2016.

24   ***exercising our enforcement remedies under our security***.
25   ***That's what they did. So, their liability was***
26   ***triggered***.

Pg. 5
6.   ***THE COURT:  I understand. (Once triggered) [t]his is an absolute***
7    ***unconditional guaranty which waives all defenses***.
8    MR. GREENBERG: Right. Irrespective of the
9    circumstances which might otherwise constitute a
10   defense –
Pg. 13
14.  THE COURT:  Based upon the papers and ***based upon the fact***
15   ***that the plaintiff is no longing seeking*** …
16   ***anything other than the amount of***
17   ***money and the $4 million interest*** which really come out to
18   about 20 percent interest, the Court is granting summary
19   judgment ***in lieu of complaint*** in the amount of
20.  $24 million.

The Judgment Creditor obtained this money Judgment only (i) on the "Pure Leverage", or "Bad Boy" guaranty breach arising from the Debtor's effort to protect the borrower's Sutton Tower Project and its equity and its creditors, **and**  (ii) as the result of the Judgment Creditor's *waiver of any other claims, rights, or remedies,* [such as claims of financial non-disclosure, fraud, defalcation, misrepresentation of events or facts, breach of financial condition of the loans, or any other appropriate claim that could have been brought, but was expressly waived].  Of course, *the true reason for such "waiver" is that no other claims existed* other than the triggering event of the borrower's filing of a Chapter 11 case filed in an effort to save the Sutton Tower Project from what the Debtor alleged as, and believes to be, a "loan to own" scheme (*See*, below).

Clearly this Judgment could not be the result of any Debtor-conduct before 2017, *on the date of entry or before*, since all such claims were waived, and there was no reliance on any financial condition of the Debtor, his assets, much less his spouse's assets or his transactions prior to the entry of the Judgment.  Yet in this case thousands of pages of documents have been received, reviewed, and are continued to be demanded through the Code's Rule 2004 examination provisions

by the Judgment Creditor, all to collect this windfall Judgment.

### D.    The Debtor's Good Faith Efforts and Rights to a "Fresh Start"

The nature of <u>this</u> Chapter 7 filing, brought on by collection efforts to obtain payment on the now-$35+ million Judgment (accruing interest at 9% per annum) in an amount that the Debtor could never approach a significant repayment, and reflects more than the recognized and established need for his fresh start bankruptcy discharge.[7]  This Chapter 7 finds its genesis in the "commercial contract" designed to exercise control-leverage over the borrower and Debtor by the threat of a personal-liability-penalty if the borrower or Debtor exercised the unfettered right to bankruptcy protection (conduct recognized as fostering public policy), or if the borrower or Debtor adhered to the laws that mandates and fosters the fiduciary duties the borrower owed to third parties in insolvency circumstances.  At issue here is this imposition of a "penalty" as punishment if the Debtor was not willing to breach its fiduciary duties to its equity owners and its creditors.  The issues here are not inquiries by this Judgment Creditor regarding actions taken 10+ years ago by a guarantor whose financial condition was relied upon for repayment.  No such fact exists here, that justify litigation over transactions *years before the triggering event that first created the Debtor's penalty-liability from the Pure-Leverage Guaranty that had no basis in reliance on the Debtor's financial condition or asset and financial transactions, let alone those transaction with the Debtor's spouse beginning in 2006 and after*.

This Honorable Bankruptcy Court should (i) appropriately focus on the Debtor's full and honest disclosures notwithstanding the nature of the debt; and (ii) the legal rights of parties related

---

[7]        There is a strong bankruptcy policy of equal treatment of similar rights and promotes policy favoring debtor's fresh start unencumbered by past commitments. In re Ward, 194 B.R. 703, (Bankr. D. Mass. 1996).  For instance, the purpose of the Bankruptcy Code's exemption provisions is to foster historic "fresh start" goals embedded in modern bankruptcy policy by permitting debtor to maintain assets sufficient for basic necessities of life. 11 U.S.C.A. § 522. In re Funches, 381 B.R. 471 (Bankr. E.D. Pa. 2008); when conflict occurs between Tennessee law and federal bankruptcy statutes, bankruptcy policy prevails. In re Lawrence, 219 B.R. 786 (E.D. Tenn. 1998);

to the Debtor to protect their own interests, their own property and property rights, and that of their family, from financial risks created by the other spouse, as well as the nature of the debt; and (iii) the interests of non-conflicted actual creditors arising from an actual financial exchange of bargained for funds guaranteed by a debtor, and an actual loss guaranteed by a debtor (that is, the true nature of the debt).

**II.**
**BACKGROUND OF THE DEBTOR AND THE DEBTOR'S FAMILY**

The Debtor and his wife met in High School, attended separate colleges, with Rhonda Beninati graduating Phi Betta Kappa and attending law school at Boston College before beginning her practice of law with the New York law firm of Chadbourne & Parke (now Norton Rose Fulbright) doing sophisticated legal transactional work. Rhonda is far from only a "housewife" as the Movants' counsel's pleadings describe her. Although the Trustee's counsel also describes the Debtor as "Harvard trained", that is also simply false. The Debtor has never attended a single class, seminar, or even a summer session at Harvard, however, the Debtor did graduate from the respected Middlebury College and pursued a career as a self-made entrepreneur and commercial real estate developer in the Northeast United States.

Joseph and Rhonda moved from New York to Connecticut in 2006. As most all large-project real estate developers, the Debtor was less risk adverse than his wife and, after the "Great Recession" of 2008 that saw much commercial real estate values in the Northeast reduced by 50% or more, the family decisions on risk became more important. Significantly, even the Great Recession did not result in a single project of the Debtor going into bankruptcy, although it caused significant financial strain. Partially as a result of the 2008 experience, Rhonda formed Persistence Partners IV LLC in 2009 to own fee sharing agreements and later formed and/or owned other

entities,[8] while Joseph continued to develop, manage and operate new ventures, including BH Sutton Owners, LLC and BH Sutton Mezz, LLC, and the related owner-entities involved in the Sutton Towers Project.  [*See*, Note 30 *infra*].  As a matter of initial financing and development, *the Debtor did not guaranty any of the aforementioned projects*.

The significance of the ownership title to property recorded solely in Rhonda's name, dating back before 2006, and P4's ownership by Rhonda documented in the public records from its inception in 2009 stems from the fact that in Connecticut recorded title in any individual removes the presumption of a marriage co-tenancy or common ownership.[9]  All transactions by and among the Debtor and his wife Rhonda regarding her sole title, and dating back over 14 years, were valid, binding, and appropriate acts under both Connecticut law (since before 2006) and later under Texas law (since moving from Connecticut to Texas in 2017).

In fact, in 2017 when Joe and Rhonda moved to Texas, both obtained their separate legal counsel to advise on how to handle and document their distinct property interests as recorded in Connecticut since it is not a community property state, and Texas is.  As a result of independent legal advice, a marital property agreement (the "MPA") was executed that implemented on November 8, 2017 the same status as in Connecticut, but now documented under Texas law.  The terms of the MPA make clear that the parties intended to simply carry forward the spousal rules and protections of actual recorded ownership of one spouse under Connecticut law into the "separate property" and "sole managed and controlled community property" rules under Texas law, by the terms set out in the MPA.  The Connecticut and Texas rules of non-spousal liability on

---

[8]        *E.g.,* J Double M, Inc., Pittman Cottage Trust, *etc.*

[9]        Connecticut General Statutes § 46b-37(a) provides that: "All purchase[s] made by either husband or wife in his or her own name shall be presumed in the absence of notice to the contrary, to be made by him or her as an individual and he or she shall be liable for the purchase." This section of the statute lends recognition to the ability of each spouse to acquire property individually and to be liable individually for its purchase in the absence of notice to the contrary.

contract liabilities of the other spouse to which the spouse is not a party were also carried forward. (*e.g.*, Rhonda had, and has, no personal liability on Joseph's contract debts).[10]  Thus, since the MPA simply memorialized the assets and debts as they existed under Connecticut law, there was no "transfer" issue as to existing property (at the time of the re-location to Texas, such that separate property in one state retains its separate property character when brought to Texas). The Texas Marital Property Agreement that memorialized the separateness of both assets and liabilities as they existed in Connecticut, and as brought to Texas, does not violate any "transfer" rules giving creditors the ability to avoid the Marital Property Agreement terms.  Of course, the MPA has been disclosed and produced.

And, because the parties are always allowed to divide their future assets and property (future creditors do not have "future" rights in "future" property before property is acquired by a non-liable spouse) the Texas MPA is designed to give notice to creditors, old and new, of the nature of newly acquired property by each spouse.

## III.
## THE JUDGMENT CREDITORS PAST THREE YEARS OF PRE-BANKRUPTCY DISCOVERY

Any suggestions that the Judgment Creditor has not had access to, and not been active in its efforts to find some transaction to criticize or some asset to attach, are simply not true. The Judgment Creditor has served discovery on the Debtor's bank, on Rhonda's company P4, LLC, on CohnReznick, CPA (the Debtors tax CPA) and others, and obtained significant document

---

[10]     In *Dennis v. Shaw*, the Supreme Court of Connecticut held that, ***in absence of express agreement or of conduct on the wife's part giving rise to implied agreement to pay for the husband's expenses, the wife was under no common law or statutory duty to pay for the husband's funeral expenses***. *Dennis v. Shaw*, 137 Conn. 450 (1951) [Emphasis Added]. The court further stated that the plaintiff

> "cited no substantial authority for such liability of the wife… [and t]he very great weight of authority is that there is no such liability at common law." *Id.* at 451; citing *O'Hagan v. Fraternal Aid Union*, 144 S.C. 84, 88, 141 S.E. 893, 57 A.L.R. 397  and note, 400; *Rutecki v. Lukaszewski*, 273 App.Div. 638, 640, 79 N.Y.S.2d 341; Collins v. Sam R. Greenberg & Co., 73 Ga.App. 377, 378, 36 S.E.2d 484; *Compton v. Lancaster, Ky.*, 114 S.W. 260 ; 27 *Am.Jur.* 59,27 *Am.Jur.* 59,  §
> 460; 41 *C.J.S.*, Husband and Wife, § 63 , page 533.

discovery including the following:

    a.    subpoenaed the bank accounts of the Debtor, his wife and children at Wells Fargo Bank and Fidelity Investments in *April-May 2017*;

    b.    froze the Debtor's son's 529 college account at Fidelity Investments in *April 2017*;

    c.    froze the Debtor's IRA at Wells Fargo *in 2017*;

    d.    served post judgment interrogatories on the Debtor's wife, which were responded to in *June 2017*;

    e.    subpoenaed financial and accounting records from the Debtor's accounting firm CohnReznick. CohnReznick complied with the subpoena in *November 2017* and delivered tax returns for 10 entities along with the Debtor's joint returns for tax periods dating back to 2012, and

    f.    pursuant to a letter reserving privilege, CohnReznick produced additional accounting records of Persistence Partners IV, LLC ("P4")[11] the Debtor's wife and certain other entities that she owned in *2018*.

However, for the past 3 years the Judgment Creditor has done nothing to attach or seize assets (other than the wrongful attachment and freezing of the Debtor's exempt IRA 3 years ago, notwithstanding the fact that the IRA was clearly qualified and exempt from such attack).[12] The wrongful attachment of that asset alone has caused significant damages to the Debtor, yet every effort at discovery by the Judgment Creditor has been almost unopposed by the Debtor in every respect.  Any suggestion or narrative otherwise is likewise untrue.

---

[11]    P4 was formed and owned by the Debtor's wife as her separate property. That ownership was confirmed in connection with the Chapter 11 plan confirmed by P4 in the United States Bankruptcy Court for the District of Connecticut. The Debtor has never owned any interest in P4.

[12]    This frozen IRA account remains with Wells Fargo and will be the subject of a Turnover Adversary to be brought by the Debtor.

This prior discovery produced (or at least disclosed in detail) all significant transactions through access to the Debtor's tax returns from 2010, and all financial records from large financial institutions not just involving the Debtor, but on his non-party, non-debtor wife, his three children, and various non-party entities and trusts.   It is truly a false narrative that this Judgment Creditor came to this Court either empty handed of discovery and information, or as a result of losses suffered by the conduct of the Debtor.   Neither are true.

## IV.
## BACKGROUND OF THE SUTTON TOWER PROJECT AND THE MANIPULATED TRIGGERING EVENT RESULTING IN THE JUDGMENT

### A.    The Original Developers

The original Bauhouse entities[13] and its owners and developers had a vision for the development of a 1,000 foot building on the waterfront of midtown Manhattan in the historic Sutton Place neighborhood located at 428, 430 and 432 East 58th Street, New York, New York 10022 (the "Project" or the "Sutton Tower Project").   Development was through service and related contracts to Bauhouse Group 1, Inc. ("BHI") operated by the Developers, including the Debtor, Christopher Jones ("Jones") and Daniel Lee ("Lee") (all referred to collectively as, "Developers") in varying roles. The Bauhouse Entities, however, did not own any interest in the

---

[13]     Neither Bauhouse entity owned any interest in the Sutton Tower Project. **Bauhouse LLC** was formed in 2013 to do real estate development in NYC.  Bauhouse LLC was formed by an attorney at Eisenman Levine by the name of Ed Duffy.  It was a New York LLC and it has filed a final tax return in 2017.  Bauhouse was merely a developer not an owner.  Bauhouse was never a borrower or guarantor of debt.  In fact, Bauhouse was a service provider and creditor to special purpose entities that owns real estate just like any other service provider such as an architect.  All of Bauhouse LLC's $25,000 of startup capital came from Rhonda Beninati.  The tax returns of Bauhouse LLC show it being owned 33.3% by each of Joseph Beninati, Chris Jones and Danny Lee, however, the Operating Agreement shows sole member is Joseph as it was never updated.[13]

**Bauhouse Group I, Inc. ("BHI")** was formed on February 10th of 2014 as a NY corporation that would be an S-Corp due to tax structuring and was owned 55% by Rhonda. However, as relates to Joseph there is a 2014 tax return that incorrectly states JB owns 50% of BHI.  The mistake by CohnReznick was corrected in 2015 to show that Rhonda owned 55% and Danny Lee and Chris Jones 22.5% each on the 2016 return.   BHI then collected development fees from special purpose entities that owned real estate and paid some of those fees to JMM.

BHI was an unsecured creditor in the Sutton Tower Chapter 11 bankruptcy.  BHI became a creditor because it had a multimillion development contract with the Sutton Tower entity that was in bankruptcy.  BHI was merely a service provider to the Borrower, and therefore a creditor to the Borrower and was treated as part of the unsecured creditors class in the bankruptcy.  BHI is also party to the malpractice lawsuit against Herrick.

Project itself but were the service companies to the Project Owner entities which also became the "borrowers."[14]

### B.     The Project Team of Conflicted Kalikow Family Members

The Project team included the world-renowned and Pritzker Prize winning architectural firm of Foster + Partners, and, vitally important to this summary, the lawyer named **Richard Kalikow**, (herein "Attorney-Kalikow") of Herrick, Feinstein LLP ("Herrick").  It is the Kalikow Family (based on Attorney-Kalikow's recommendation) that became the lender to the Sutton Tower Project Owners and it is the "Kalikow Family Interests" that hold the deficiency Judgment against the Debtor, and whose lawyers now represent the Chapter 7 Trustee in this case. It is the "Kalikow Family interests" that obtained foreclosure title to the Project under loan document terms approved by Attorney-Kalikow purporting to be the lawyer *for the Project* – terms that were very unfavorable to the borrowers (the Project Owners) and Developers (including the Pure Leverage Guaranty). It is the Kalikow Family Interests' lawyers that conducted almost 3 years of pre-bankruptcy discovery, and that now represent the Chapter 7 Trustee (notwithstanding that the likely major asset of the estate is the malpractice suit pending on appeal in New York against Attorney-Kalikow and his law firm, which conflicted representation ultimately resulted in the Kalikow Family Interests' foreclosure takeover of the Sutton Tower Project.)[15]  This conflict is addressed below in greater detail.

---

[14]     Initially, "Project Owners" were BH Sutton Owner, LLC BH Sutton Mezz, LLC and Sutton 58 Owners, LLC (the three entities holding title to the Project and were the Borrowers.).  *See*, Note 30 *infra* listing the later owner-entities and the Chapter 11 debtors when the Sutton Tower Project was placed in bankruptcy.

[15]     In a pair of recent decisions, Justices Shirley W. Kornreich and Lawrence K. Marks of the Commercial Division ruled that creditors could proceed on their fraudulent conveyance claims seeking reversal of asset transfers made by debtors under New York's Debtor and Creditor Law ("DCL") and a Consent Foreclosure and Sale Agreement ("CFSA") *CDR Creances S.A.S. v. First Hotels & Resorts Investments, Inc.*, No. 650084/2009, Justice Marks. *Stillwater Liquidating LLC v. Partner Reinsurance Company, Ltd.*, No. 652451/2015, Justice Kornreich. The recently enacted "Uniform Voidable Transactions Act" (the "UVTA") does carve out NY "strict foreclosures" (in which a debtor consents to the secured creditor's acceptance of collateral in full or partial satisfaction of the obligation, without a public sale or judicial foreclosure)

### C.    The Sutton Tower Project

The land assemblage alone (not including improvements) upon which the Sutton Tower would be built was initially appraised at $181 million "as is", $277 million with a completed foundation and over $1 billion "as completed".[16]  At the time the loan was made this $181 million appraisal was over $70 million greater than the total debt advanced by the Judgement Creditor. Although in planning for several years, beginning in early 2015, the initial phase of the Sutton Tower Project required that the Developers:

> (1)    acquire the properties on which the envisioned 1,000-foot tower will be constructed, namely 428, 430, and 432 East 58th Street, New York, New York (collectively, the "Real Property");

> (2)    negotiate and obtain surrender agreements (the "Surrender Agreements") from the 22 tenants of the existing buildings on the Real Property (the "Original Buildings");

> (3)    purchase certain unused zoning development rights and construction license agreements from neighboring property owners, which are necessary to construct a tower of the size contemplated under "as of right" New York City zoning law; and

> (4)    obtain inclusionary housing certificates acquired from an affordable housing project that the Project is funding.

### D.    The "Kalikow Family" As Lawyer for Borrower and Lenders to Borrower

The intricate details of the Sutton Tower Project development work required not only

---

[16]    The values are taken from a February 22, 2016 report completed by Cushman & Wakefield, an independent, sophisticated, world-leading firm that is unaffiliated with the Debtors.  The report was completed for an unaffiliated third party that proposed to invest $140 mm into the Project. Separately: (i) two of the largest residential brokerage firms in New York City – Douglas Elliman and Corcoran Sunshine – estimated that the "as completed" building would be valued at $840 mm and $770 mm, respectively; and (ii) the Judgement Creditor valued the "as completed" building at $1.4 billion in June 2015 when they exercised an option to purchase an apartment at the Project.

sophisticated legal counsel but sophisticated lending counsel. As noted above, the Developer entities retained Herrick, Feinstein, LLC (hereinafter, "Herrick") as counsel on the Sutton Project pursuant to a retainer letter dated June 24, 2014, naming attorney **Richard R. Kalikow**, a Herrick partner, as in charge of representation of the Developers (he stated in the retainer letter: "I will personally supervise and coordinate the rendition of services involved in this matter."). Although "**Sutton Owner NY**" was Herrick's only named client in its Retainer letter, in or about January of 2015, Herrick stated in separate transaction documents that it also represented BH Sutton Mezz, LLC ("Sutton Mezz DE"), and even claimed to represent *Beninati, Jones, and Lee* individually, although it had no retainer letter with these individuals and entities they worked for, and certainly no conflicts waivers as he advised on such matters as approving and signing the guaranty at issue in this case.[17]

When the Retainer Letter was initially executed, the Developers intended to obtain financing from Banco Inbursa, S.A. ("Inbursa") to secure surrender agreements from various property owners and certain development rights. Inbursa had issued its term sheet for a $70,000,000 loan, which stated that it would be funded in December of 2014. Attorney-Kalikow suggested (as either as a backup, or a new lender) that the Developers meet his cousin, Richard N. Kalikow (whose entities became the "Kalikow Lender" and to become known as the "Gamma I") to discuss a development loan to the Project Owners. Attorney-Kalikow's recommendation of his cousin, Richard N. Kalikow turned out to include his cousin's son Jonathan, who was the President of Gamma Funding, LLC, and that ultimately provided the initial funding on the early part of the Sutton Tower Project. As the Court recalls, it is the Judgment Creditor that claims the Debtors assets are "dizzyingly" complex – nothing the Debtor has done compares to the Kalikow Lender's

---

[17]     *See*, Attorney Buttafuoco Aff. Exh. "B", First January Opinion Letter and Exh. C, Second January Op. Letter.

multiple-tiered lending entities employed to ultimately obtain title to the Sutton Tower Project.[18]

Unknown by the Developers as the time, Herrick's billing records confirmed in the malpractice suit, now pending on appeal, that Attorney-Kalikow had $393,078.36 in billing attributed to his relatives at Kalikow Lenders and its affiliates from January 1, 2014 through February 28, 2016. *Clearly, Kalikow Lenders were substantial clients of Attorney-Kalikow and his law firm.* Much of the difficulties (not addressed in any detail in this summary but involved in the malpractice suit) involved the Kalikow lender, managed by N. Richard Kalikow, his son, Jonathan Kalikow Esq., and Kalikow Lender's cousin, Attorney-Kalikow (collectively the "Kalikow Family") and a concerted, controlled, and artfully choreographed "loan to own" and gain control of the billion dollar Project from the borrowers.

Based on Attorney-Kalikow legal advice and the recommendations regarding the loan documents and agreements, the Kalikow-Lenders ultimately funded approximately $110 million toward the Project, nearly $70 million less than the appraised value at the time.[19] Later,

---

[18]     Sutton Mezz DE owns 100% of the membership interests of Sutton Owner DE. Gamma Lending S58 LP is a limited partnership formed on January 5, 2015 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Gamma Lending S58 II LP is a limited partnership formed on May 29, 2015 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Sutton 58 Associates LLC (ultimately the judgment creditors) is a Delaware limited liability company formed on June 3, 2015 with its principal place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Gamma Lending II is the managing member of defendant Sutton 58 Associates (at to this Delaware entity—it was formed in May of 2015 yet Gamma 1 was January of 2015, and Gamma II June of 2015). Gamma Funding LP is a limited partnership formed on March 10, 2014 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Gamma Funding Management LP is a limited partnership formed on July 9, 2014 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Gamma Funding, LLC is a limited liability company formed on March 10, 2014 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178. Gamma Real Estate LLC is a limited liability company formed on October 7, 2014 and organized under the laws of the state of Delaware with a place of business at 101 Park Avenue, Suite 2602, New York, New York 10178.

[19]     On or about January 16, 2015, Sutton Owner NY and Gamma Lending, which Kalikow Lenders created for this transaction, executed a loan agreement in the principal amount of $32,250,000. (the "Original Loan"), which was secured by a mortgage on the property and the acquired development rights. On the same date, January 16, 2015, Sutton Mezz DE and Gamma Lending entered into a mezzanine loan agreement in the principal amount of $20,000,000, which was secured by Sutton Mezz DE's ownership interest in Sutton Owner NY. These two loans were accompanied by the First January Opinion. Letter (*See*, Buttafuoco Aff. Exh. "B"), which was executed by Herrick and listed Sutton Owner NY, Sutton Mezz DE, Beninati, Jones and Lee as Herrick's client. It did not list Bauhouse Group, which was the only signatory to the waiver. Nor was Bauhouse a signatory to any of the Loan documents.

recognizing the conflict of interest arising from its relationship between Attorney-Kalikow and the Kalikow Lender and his companies (as well as the family relationship), on or about December 5, 2014, Attorney-Kalikow and his law firm presented a purported "conflict waiver" ("PCW") to the "Bauhouse Group" (which was essentially a stranger to the transactions having no ownership or control role in the Sutton Tower Project other than fees received for service provider of development services), stating that Herrick had been asked to represent the Bauhouse Group and its affiliates (referenced as the "Borrowers") in connection with" a proposed loan from Gamma Funding, LLC.("Gamma") secured by the property (defined in the PCW as the "Loan").   But even this waiver (PCW) was defective in both parties and details.[20]

Nothing was as it was represented to the Developers by the Kalikow Family transactions. In the six months between the Gamma I loan and the Gamma II loan, there were disagreements and issues between the Developers and the Kalikow Lenders and its multiple entities,[21] involving

_____

Notably, the January 16th letter listed the individual bad-boy guarantors as firm clients, although the firm had no retainer agreement or conflict waiver with them. The letter also stated that "certain provisions contained in the Loan Documents may not be enforceable" but did not specify which ones, nor was this information conveyed to Developers or their principals. One week later, Sutton Owner NY and Gamma Lending amended the original loan agreement, which was accompanied by another letter executed by Herrick (Buttafuoco Aff., Exh. "C") which contained the same significant provisions as the First Letter. Because the $63,000,000 which Sutton Owner NY obtained from Gamma I represented only a small fraction of the $500,000,000 needed to finance the entire project, the Gamma I financing documents purportedly allowed another lender ***to take a first position on a loan up to $150,000,000***.

[20]    The purported conflicts waiver:
   •   failed to specify which entities were the "Borrower" and which were the "Lender".
   •   It failed to fully describe the nature of the conflict, merely stating: "By way of clarifying the nature of our intended representation of the Borrower in the loan and to further avoid any potential conflict of interest or the appearance of any such a conflict, please note that ***the firm shall represent only the Borrower in the Loan and we expressly shall not represent Lender***."
   •   PCW failed to mention the personal/family relation between the Kalikow Attorney and Kalikow Lenders.
   •   It also did not purport to cover any future transactions besides the stated loan ("Gamma I").
   •   The purported conflict waiver was not signed by any of the Developers except for Joseph Beninati, who signed the waiver on behalf of the "Bauhouse Group", but none of the individual or corporate entities of the Developers were mentioned in the waiver nor were they made signatories.

[21]    Disputes continued between the Borrowers and the Kalikow Lenders concerning:
   (1)    the Kalikow Lenders' disagreement on the building plans by the architect Beninati hired, and refusal to allow Beninati to release the funds to pay the architect and other critical professionals;
   (2)    the Kalikow Lenders' insistence that Beninati discharge his financial advisor and hire one more favorable to the Lender;
   (3)    Beninati's expressed concerns that the Lenders were taking charge of the project;

the negotiations by Attorney-Kalikow with his cousins and family, the Kalikow Lenders, involving their direct involvement in the Sutton Tower Project.[22]  These issues included the insistence of the Kalikow Lenders' that plaintiff's financial advisor be removed; that the Kalikow Lenders considered the borrowers and their representatives (the Developers) to be in "technical default"; the Kalikow Lenders' failure to share critical information with the Developers; and most importantly, Kalikow Lender's refusal to allow Developers to bring in the critical $150 million dollars required to keep the project developing on schedule, which loan would prime the Kalikow Lenders' advances, because of the Kalikow Lenders' claim of a "technical default."[23]

With the obligation to subordinate their loan now gone, during this time, Attorney-Kalikow permitted, without objection, the Kalikow Lender/Family to: (i) exercise of dominion and control over the borrowers and Developers' finances, (ii) structure development transactions on very unfavorable terms;[24] and (iii) communicate with the borrowers and Developers' professionals

_____

(4)      the Kalikow Lenders' failure to provide the funds Developers needed to get the permits to demolish the buildings, requiring Developers to lay out the funds; and

(5)      Attorney-Kalikow's view of the Developers as being at least technically in default under the loan documents of October 2015.

[22]      As an example, with regard to conflict, in June of 2016, before the Gamma II closing, a dispute erupted between Kalikow lenders and third parties with regard to adjacent air rights needed to build on the Sutton property after the loan closed. Kalikow Lenders contacted Herrick partner, William Fried, and demanded he start an action against the alleged obstructive third parties despite fact that Fried represented the Borrower not the Lender. Developers wished to deal with the disputes in an amicable manner, knowing that these neighbors would be critical to having a smooth construction process.  Kalikow Lenders then began to direct Fried (who was Developers' counsel), without Developers' knowledge, on how and when to threaten neighbors. Fried took orders from Kalikow Lenders without Developers' knowledge and acted on those orders.  Further, upon information and belief, Kalikow Lenders was asking the Developers' litigation attorney- Fried, a Herrick partner, to opine on the risks to the Kalikow Lender of a liability claim by the client of another Herrick partner. (Essentially, Kalikow Lender was asking Fried for advice as to whether Kalikow Lender's actions that were contrary to Developers' would expose them to lender liability.)

[23]      Developers sought to obtain this additional financing from Inbursa, which efforts were obstructed by the Kalikow Lender by, among other things, not agreeing to subordinate the Gamma I financing (which was the original agreement). As a result of Kalikow Lender's actions and the failure of Attorney-Kalikow to deal with the Kalikow Family Lender, the negotiations with Inbursa broke down and Developers had no option but to pursue further financing with the Kalikow Lender and entities, and now on Kalikow Lender terms.

[24]      On or about April 1, 2015, the Kalikow Lenders sent Developers' Attorney-Kalikow a draft pre-negotiation agreement, which Developers were required to execute. That agreement preserved the Kalikow Lender's "ability to initiate and continue actions and proceedings, or in any manner exercise any rights or remedies available to it under or otherwise related to the [Gamma I' Financing' Documents or the [Gamma I financing], while requiring Developers to surrender any "defenses, offset, cross claims or counterclaims in connection with any actions, suits or proceedings nor or hereafter instituted by the Lender with respect to the Loan, "as well as any affirmative claims against the Lender or its principals based on a theory of 'lender liability', laches or estoppel, or any similar theory with respect to the

about directing the Project.   During this time three new loans were made and Gamma I was paid off.[25]  In addition to security by a mortgage on the real property and development rights, and Sutton Mezz DE's ownership interest in Sutton Owner DE, this consolidated series of new loans were to be guarantee by the new "**Pure Leverage Guarantees**" from the Debtor, Jones, and Lee, although the original and all prior renewal loans were non-recourse.

### E.    The Kalikow Lenders Used the Claimed Defaults and Attempted Foreclosure

After literally months of disagreements and disputes,[26] with the "bad boy" guarantees now in place, in early 2016 the Lenders precipitously "pulled the plug" on the Developers advances that were then due to be made to the Project, and attempted to take over the Project through a quick, manufactured, non-judicial sale under the Uniform Commercial Code (the "UCC").[27]

### F.    The Borrowers and Project Owner's Chapter 11 Case

The borrowers were facing foreclosure which would leave millions of dollars in creditors

---

Loan." (Buttafuoco Aff., Exh. "D") Despite this red flag, the Kalikow attorney failed to either obtain an appropriate waiver from his clients, and to adequately represent them with regard to the onerous requirements of the loan and the April 1" Agreements he advised them to sign (including the Pure Leverage Guaranty).  The April 1 Agreement did not mention a conflict waiver and it did not purport to amend or change the executed Waiver.

[25]     The first was an Acquisition Loan mortgage loan executed by Sutton Owner DE and Sutton 58 Associates in the amount of up to $125,800,000 from Gamma  which was consolidated into a single amended and restated mortgage. There were two other loans, a $1,400,000 building loan to Sutton Owner DE and a $20,000,000 mezzanine loan to Sutton Mezz DE.

[26]     Kalikow Lenders' improper conduct included creating fabricated defaults under the lending agreements, failing to fund the Project at critical times and never actually sending a notice of default or opportunity to cure prior to maturity. Instead of complying with their own loan documents, Kalikow Lenders stopped financing the Project at a time when the Debtors still had at least $20 mm in available committed funds.  By strangling the Debtors' cash flow with immaterial and fabricated defaults, notice of which was not provided to the Debtors, Kalikow Lenders caused substantial harm to the Project, allowed mechanics' liens to be filed against the Project and left the Project in the midst of demolition. This caused public safety issues and reputational backlash. The Kalikow Lenders knew their strategy would create a situation of havoc and, in fact, immediately prior to the bankruptcy filings, Kalikow Lenders' attorney boasted in State Court that "*we have been preparing for this day from day one*."

[27]     The Kalikow Lender made representations and took actions that led the Developers to believe that they would be forming a joint venture (a joint venture partnership agreement was even attached to the one-sided lending documents, which were never explained to the Sutton Principals). Likewise, Attorney-Kalikow cultivated a sense of trust and then manipulated and/or agreed to terms in the loan documents that clearly benefitted Kalikow Lender to the detriment of the Debtors. In doing so, from inception, Attorney-Kalikow created an aura of complexity and confusion to benefit the Kalikow Family and to corner his clients in an untenable position. Kalikow Lenders then attempted to avoid the traditional foreclosure process under New York law by commencing the non-judicial, UCC sale process. This could not have occurred but for the insider information that Kalikow Lenders enjoyed and through the concerted actions of Attorney-Kalikow, Kalikow Lenders and Kalikow Lenders' counsel.

or third-party commitments unresolved.  Litigation that resulted from the Kalikow Family advice was designed to further the Kalikow Family's efforts and ultimate goal of the Lenders/Family to take over the Sutton Tower Project and reap the reward of all its profit.  Using unconventional means and insider information related to the Sutton Tower Project and its Developers and their business strategies, the Lenders/Family placed the Developers in an untenable position,[28] leaving the Debtor and new equity partners (defined below) with no manner to exercise their fiduciary duties to creditors of the project or protect their borrowers' investment in the project, other than to file Chapter 11 (*thereby triggering the Bad Boy Guaranty*).

Actually, the borrowers were approached by new equity partner, the Pilevsky family, a NY developer that formed "Sutton Opportunity", and entity that agreed to furnish the legal team, the experts, and the expertise to fund and prosecute Chapter 11 filings for the Borrowers, in exchange for 50% interest in the ownership of the Sutton Tower Project and control of the Chapter 11. Although the Debtors' resulting Chapter 11 filings[29] prevented these Kalikow Lenders from engaging in illegal activity through a "back door play" against the Project, and prevented the Developers from incurring liability for breach of their fiduciary duties to the borrowers and third parties,  the Chapter 11 new partner and its law firm prosecuted the Chapter 11 until the DIP financing was blocked by the new partner and the Project was turned over to the Kalikow Family to foreclose.

---

[28]  As an example, Attorney-Kalikow and Herrick represented the Kalikow lender on another deal involving a proposal to purchase real property at 520 Fifth Avenue at the same time he purported to represent the clients, which deal was adverse to the interests of the Developers.

[29]  **The Bankruptcy Cases**:  On February 26, 2016 (the "Sutton Mezz DE Petition Date"), Sutton Mezz DE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.  Sutton Mezz DE continued in management of its business and operation of its affairs and properties as a debtor and debtor-in-possession under §§ 1107 and 1108 of the Bankruptcy Code.  On April 6, 2016 (the "Sutton Owner DE Petition Date"), Sutton Owner DE filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.   On July 11, 2016 (the "Sutton Owner NY Petition Date" and, together with the Sutton Mezz DE Petition Date and Sutton Owner DE Petition Date, the "Petition Dates"), Sutton Owner NY filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Court.

## V.
## THE KALKOW MALPRACTICE SUIT

The Borrowers and Developers discovery of the conflicts and mishandling of the affairs of

the Borrowers and Developers' interests resulted in the filing of a malpractice suit in New York

state court.   Remarkably, and notwithstanding the bankruptcy court's pronouncement that noting

in the borrowers Chapter 11 cases would impact the Debtor and the non-debtor malpractice claims,

the state court granted "the motion to dismiss on the grounds that the claims here are barred by

collateral estoppel and res judicata."  The court held that "[t]he claims that are raised here were

necessarily raised *and could have been raised before the bankruptcy Judge*. . . the claims of

malpractice were again raised before Judge Scarpulla who went through the Cause of Action,

though there were more, in a more summary fashion than the current complaint before me…."

Appeal has been perfected in this suit and claim (one of four of which Plaintiffs is the Debtor),

briefs filed, and a decision may be expected.   The Chapter 11 did not involve the suit by the non-

debtors against the Attorney-Kalikow or his law firm and should ultimately be resolved by reversal

and remand to State Court.  The Debtor acknowledges that the Trustee (as distinct from the clearly

conflicted Trustees' counsel representing the Kalikow Family interests) owns a portion of this

recovery as likely the most valuable asset of the estate.

## VI.
## THE P4 INTERESTS

**A.     The P4 Interests:**  Only last week have Movants noticed a new Rule 2004 Exam

served on Persistence Partners IV, LLC [30] ("P4"), although the Debtor has no direct or indirect

ownership or other rights with respect to P4 (other than as a former salaried at-will employee until

August 2016).  The ownership and rights in P4 were owned since its formation in 2009 by Rhonda,

---

[30]     The Debtor did have an indirect interest is an earlier entity known as the earlier Persistence Partners, as beneficiary of a revocable trust owning 99%, the Debtor has never owned an interest in the P-4 entity since its formation in 2009.

or an entity solely owned by Rhonda, until April of 2018, when Rhonda gifted her P4 membership interest into the Pittman Cottage Trust, which has been disclosed and produced.  P4 owns several investments that generate income to P4 occasionally.   Much of the value of P4 arose from its ownership of two "Fee Sharing Agreements" that arose from a large real estate development project (the "Fee Sharing Agreements") that has been the subject of the Judgment Creditor's demands and prior disclosures, and which do not deal in any respect with the Sutton Tower Project.

B.      **The Fee Sharing Agreements**:   P4 owned an interest in the Fee Sharing Agreements since they were originally negotiated by P4 and several other parties. In January of 2010, following a series of restructurings and buy-outs among certain original developers and parties that had become involved and invested in the vertical development of a 323 acre master planned development on the waterfront of Stamford, Connecticut (the "Stamford Project"), P4 entered into the two Fee Sharing Agreements with the entities that owned the properties and development rights that comprised the Stamford Project.  Pursuant to each of the Fee Sharing Agreements entered into by P4 and other non-affiliated persons and entities, P4 was entitled to, among other fees, twenty five percent (25%) of fees generated by each of the two development companies responsible for the construction of the Stamford Project, in addition to other fees related to leasing, rental income, as well as other metrics. Between 2010 and 2014, P4 received payments under each of the Fee Sharing Agreements.  Beginning in 2015, the counterparties to each of the Fee Sharing Agreements began to "accrue" all fee payments.  In addition to the accrual of fees, P4 believed other fees had not been accurately reported and paid and thus, P4 commenced arbitration.

C.      **The P-4 Chapter 11 Filing and Plan Confirmation**:   In order to protect and preserve its asset and deal with P4 creditors, including a debt due to MachMG on a claim secured by P4's interest in the Fee Sharing Agreements, P4 filed its Chapter 11 case.  This case, and matter, was ongoing at the same time as the Sutton Tower Project was ongoing.

The arbitration among the Fee Sharing Agreements-Parties continued through the Chapter 11 of P4 and was ultimately resolved and settled resulting in the payment in full of all P4 creditors' claims.  The successful (but highly confidential) arbitration and settlement that dealt with 23 separate Harbor/Gateway Parties and 16 P4-related parties entered into on September 6, 2017. The terms of the Settlement Agreement were not disclosed in the P4 bankruptcy (other than "in camera" disclosure) but except to the extent that disclosure was made that all claims would be paid from the Settlement proceeds and equity would be retained by Rhonda Beninati, no other terms were disclosed.  As a result of the settlement, P4 filed and proposed a 100% payment plan that allowed all debt to be paid with statutory interest and allowed Rhonda to retain her 100% equity interest in P4.  Bankruptcy Judge Julie Manning confirmed the payment in full Plan.

Important to the filing by P4 of its Chapter 11 case was the fact that the equity interest of Rhonda Beninati was fully disclosed, was handled and provided in the Plan and Disclosure Statement, and as a result of payment in full of all creditors' claims, preserved by the *res judicata* effect of the Confirmation Order recognizing 100% of the equity ownership in Rhonda Beninati. In addition, the other assets and interests owned by P4 were also disclosed in the Chapter 11 case. P4 owns a variety of interests in real estate entities each of which is a passive real estate asset or claim, none of which are controlled by P4 and all of which are entirely illiquid.

The P4 Chapter 11 was well-known in the New York real estate development community, drawing the attention of a number of publications as well as naming and referencing the Kalikow Family interests as an involved party through the Sutton Tower Project.  Although with actual notice of the Chapter 11, the Kalikow Family interests made no appearance nor sought any relief, primarily because it was not a creditor with a claim to any equity or interest in P4 or the Stamford project. The Judgement Creditor also sent a subpoena to P4 during its Chapter 11 regarding certain interests and issues but elected to make no appearance.  After Confirmation of the Plan and

payment of all Creditors' claims, P4 continues to own its interest in the confidential Settlement Agreement.

## VII.
## THIS BANKRUPTCY CASE AND THE DEBTOR'S
## EFFORTS AND FULL AND COMPLETE DISCLOSURES

This Chapter 7 relief filed on January 20, 2020 was precipitated by the continued discovery of the Judgment Creditor, commencing in late 2019 by a discovery proceeding filed in Dallas *which was not served on the Debtor*.  Only after the Debtor discovered orders had been entered in the Dallas discovery suit brought by the Judgment Creditor's lawyers whose office was in Dallas County, did the Debtor discover that the "green card" signature on the "return receipt requested" notice used by the Judgment Debtor in Dallas County, was not the Debtor's signature and is a forgery.  As noted above, the venue motions were all untimely and denied, and thus faced with the incredible expense of a Dallas turnover proceeding and discovery, this Chapter 7 was filed.

From the outset, it is the ***Movant's*** that have sought the delays in discovery and repeatedly offered extensions provided the Debtor would agree to a commensurate extension of bar dates was accepted. The Debtor agreed to extensions, but not as proposed by the Movants, and timely responded to Movant's request for production so as to be available for his 2004 examination within two weeks of the production.  The Debtor immediately began to gather the thousands of pages of documents responsive to Movant's duces tecum demands for documents and determine which had not yet been produced.   Initially the requested extension was based on a series of untrue allegations designed to suggest that this Debtor is hiding assets.  Moreover, the Motion suggests that Movants have little information and have had no opportunity to conduct discovery of the Debtor's financial situation.  Finally, the Movants wrongly suggest that the Debtor and his wife have been dilatory in responding to Movant's discovery.  As illustrated herein, that false narrative of a creditor with little information about its debtor is simply not true.  There was no evidence before this Court

supporting any of these allegations simply because most of these allegations were not true.  What the Judgment Creditor sought to create as a false narrative (that, as a lender having loaned, and lost the loan proceeds on a project that it entered into on the faith of the Debtor's financial guaranty) likewise is not true.   As is illustrated above, not only is this truly a "false narrative" but also, and in fact, it was only the Pure Leverage Guaranty that resulted in the "windfall" Judgment for the Sutton 58 Judgment Creditor, obtained only by the triggering of the Pure Leverage Guaranty.   This Judgment Creditor never relied on or had a right to rely on, the personal or family financial condition, transactions, or even disclosures of this Debtor.

WHEREFORE, the Debtor Joseph Beninati requests a Scheduling Order of this Court for all Rule 2004 examinations, and an order extending the deadlines set out in the Motion of the Judgment Creditor and Trustee for a reasonable but limited times above stated, and for such other and further relief to which the Debtor may be justly entitled, at law and in equity.

Dated:   June 24, 2020

Respectfully submitted,

/s/ *Shelby A. Jordan*
Shelby A. Jordan
Attorney in Charge
State Bar # 11016700
**JORDAN, HOLZER & ORTIZ, P.C.**
500 North Shoreline Blvd, Suite 900
Corpus Christi, Texas 78401
Telephone:  (361) 884-5678
Facsimile:  (361) 888-5555
Email: sjordan@jhwclaw.com
**Lead counsel to Debtor Joseph P. Beninati**

## **CERTIFICATE OF SERVICE**

      I hereby certify that on June 24, 2020, I personally caused to be served a true and correct copy of the above and foregoing document, by electronically filing it with the Court using the Court's CM/ECF system, which sent notification to all parties of interest receiving notice in this case through the CM/ECF system, and upon the parties shown on the attached service list, via first class U.S. Mail.

/s/ *Shelby A. Jordan*       

Shelby A. Jordan

Audi Financial Services
PO Box 5215
Carol Stream, IL 60197-5215

Daniel Lee
57 Gingham Court
Irvine, CA 92602-1850

Linebarger, Goggan, Blair &
Sampson, LLP
PO Box 01-1861
Miami, FL 33101-1861

Mercedes Benz Financial Services
PO Box 5209
Carol Stream, IL 60197

Sutton 58 Associates, LLC
Phillip J. Conley **(via ECF)**
Conley Rosenberg & Mendez LLP
5080 Spectrum Drive, Suite 850E
Addison, TX 75001-6431

Rhonda Beninati
c/o Eric Taube/Evan Atkinson **(Via ECF)**
Waller Lansden Dortch & Davis, LLP
100 Congress Ave, #1800
Austin, TX 78701-4042

Volkswagen Credit Union
1401 Franklin Blvd.
Libertyville, IL 60048-4460

U.S. Bankruptcy Court
903 San Jacinto, Suite 322
Austin, TX 78701-2450

Bernard D'Orazio
Bernard D'Orazio & Associates, PC
100 Lafayette St., #601
New York, NY 10013-4400

Eric Goldstein
Shipman & Goodwin, LLP
One Constitution Plaza
Hartford, CT 06103-1919

Longhorn Strategy, LLC
100 Congress Avenue, Suite 2000
Austin, TX 78701-2745

Metlife Ashton Austin Owner, LLC
c/o William S. Warren **(via ECF)**
Warren Law Firm
1011 Westlake Drive
Austin, TX 78746-4511

RB Services Holdings, Inc.
100 Congress Avenue, Suite 2000
Austin, TX 78701-2745

Sutton 58 Associates, LLC
c/o Jay H. Ong **(via ECF)**
Munsch Hardt Kopf & Harr, PC
303 Colorado Street, #2600
Austin, TX 78701-0021

The Ashton Austin
101 Colorado Street
Austin, TX 78701-4103

Ally Bank
PO Box 78234
Phoenix, AZ 85062-8234

Constar Financial Services, LLC
10400 N. 25th Avenue, Suite 100
Phoenix, AZ 85021-1610

Internal Revenue Service
Centralized Insolvency Office
PO Box 7346
Philadelphia, PA 19101-7346

Meister, Selling & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017-5627

Other Side Industrial, LLC
100 Congress Avenue, Suite 2000
Austin, TX 78701-2745

SBA Associates LLC
401 Minnetonka Road
Hi Nella, NJ 08083-2914

United States Trustee – AU12
United States Trustee **(via ECF)**
903 San Jacinto Blvd., Suite 100
San Antonio, TX 78212-3314

Randolph N. Osherow **(via ECF)**
342 W Woodlawn, Suite 100
San Antonio, TX 78212-3314

Raymond W. Battaglia **(via ECF)**
Law Offices of Ray Battaglia, PLLC
66 Granburg Circle
San Antonio, TX 78218